
FILED

MAY - 9 2013

CLERK, ........ ...CT COURT

## <u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT</u>

I, Maria B. Milbourne, Special Agent, Coast Guard Investigative Service, ("CGIS"), ''

having been duly sworn, depose and state as follows:

## <u>INTRODUCTION</u>

1.      I am a Federal Agent, authorized to investigate violations of laws of the United

States, and I am a law enforcement officer with the authority to execute arrest and search

warrants issued under the authority of the United States.

2.      I have been a Special Agent ("SA") with CGIS for approximately three years.  I

am a graduate of the Federal Law Enforcement Training Center, Criminal Investigator Training

Program and the Special Agent Basic Training Program.  As a SA with CGIS, I have participated

in numerous criminal investigations of individuals who are in violation of statutes relating to the

laws of the United States and Code of Federal Regulations.

3.      The information set forth in this Affidavit is based upon my personal knowledge

and the personal knowledge of other CGIS SA's, conversations with USCG vessel inspectors and

pollution investigators from USCG Sector Hampton Roads, Norfolk, VA, who participated in the

Port State Control inspection of the Motor Vessel ("M/V") ANTONIS G. PAPPADAKIS in the

Port of Norfolk on or about April 15, 2013,  my review of the evidence collected from the M/V

ANTONIS G. PAPPADAKIS during the inspection, documents of employment provided to the

Coast Guard, and the statements of certain crewmembers.  The information set forth herein is

submitted solely for the purposes of establishing probable cause and does not reflect each and

every fact learned during the course of the investigation.

4.      This Affidavit is being submitted in support of a criminal complaint against

Kassian Maritime Navigation Agency Ltd. ("Kassian"), a Greece domiciled corporation with

1

LRL

mm

offices at 367 Syngrou Avenue, 175 64 Athens, Greece, on grounds that, acting through its agents and employees who were acting for the benefit of Kassian, at least in part, violated Title 18, United States Code, Section 1519, by knowingly altering, destroying, mutilating, concealing, covering up, falsifying, and making a false entry in any record, document, or tangible object, to wit: an Oil Record Book, with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States, to wit, the United States Coast Guard and the Department of Homeland Security.

5. The M/V ANTONIS G. PAPPADAKIS was a 39,017 gross ton bulk carrier vessel, registered under the flag administration of Malta and bearing the International Maritime Organization number 9087271. The ship was owned by Angelex Ltd. ("Angelex"), a Maltese company with offices at 131 East Street, Valletta, Malta, and at 367 Syngrou Avenue, 175 64 Athens, Greece. However, the ship was operated by Kassian Maritime Navigation Agency Ltd. ("Kassian"), a Greece domiciled corporation with offices at 367 Syngrou Avenue, 175 64 Athens, Greece. As the operator, Kassian was responsible for the day to day operations of the ship and responsible for supervising the ship's crew.

6. On July 23, 2007, Kassian pleaded guilty in the Middle District of Florida to conduct similar to that alleged in this case. Specifically, Kassian admitted that its employees aboard one of the vessels it operated, the *M/V North Princess*, had maintained a false Oil Record Book that concealed the illegal dumping of bilge and wastewater in to the ocean. Kassian was sentenced to pay a $1.3 million criminal penalty and placed on thirty months of supervised probation. Case No. 3:07-cr-48 J 25 (MDFL).

7. The M/V ANTONIS G. PAPPADAKIS had an Engine Department headed by a Chief Engineer. The Chief Engineer is the highest ranking officer in the Engine Department.

2

The Chief Engineer is assisted by laborers, including one Second Engineer, two Third Engineers, a Cadet, an Electrician and a Fitter. Lampros Katsipis served as Chief Engineer of the M/V ANTONIS PAPPADAKIS from May 01, 2013, until present. The crew was employed by Kassian and acted at all times herein within the scope of their employment on behalf of, and for the benefit of, at least in part, Kassian.

8. As the Chief Engineer, Lampros Katsipis had overall responsibility for the operation of the Engine Department, including the management of machinery space operations (i.e., tank-to-tank transfers, disposal of oil residue, discharge overboard or disposal otherwise of bilge waste that accumulated in machinery spaces), formulation and implementation of Engine Department procedures, and verification that all systems, including, but not limited to, the Oily Water Separator ("OWS"), were functioning and operated properly. In addition to these duties, as Chief Engineer, Katsipis was responsible for maintaining the ship's Oil Record Book, a required log regularly inspected by the Coast Guard, and responsible for recording any discharges or transfers of waste from machinery spaces from the M/V ANTONIS G. PAPPADAKIS in the ship's Oil Record Book.

## LEGAL FRAMEWORK

9. The United States is part of an international regime that regulates discharges of oil from vessels at sea known as the International Convention for the Prevention of Pollution from Ships, as modified by the Protocol of 1978 (the "MARPOL Protocol"). The MARPOL Protocol was enacted into United States law by the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901, *et seq*. The regulations promulgated under APPS apply to all commercial vessels over 400 gross tons operating in United States waters or while at a port or terminal under the jurisdiction of the United States, including vessels operating under the authority of a country

3

other than the United States. 33 C.F.R. § 151.09(a)(5). All crimes alleged in this Affidavit took place within the jurisdiction of the United States and, pursuant to 18 U.S.C. § 3238, within the venue of the United States District Court for the Eastern District of Virginia.

10. On large bulk carrier vessels, such as the M/V ANTONIS G. PAPPADAKIS, bilge waste accumulates in bilge wells, located in the bottommost part of the vessel. Periodically, this waste is pumped into a bilge holding tank. Bilge waste consists of water originating from spills and leaks from piping, tanks, and other engine room machinery. This waste may be contaminated with oil, oil residue, lubrication fluids, and other liquids that leak or drip from engines or pipes and hoses that run throughout the ship. In order to maintain bilges at safe levels, bilge tanks and wells must be periodically emptied. This can be done in one of two ways: (1) bilge waste can be discharged ashore to a waste reception facility or, (2) it may be discharged overboard after being processed through a properly functioning OWS.

11. MARPOL Annex I established international standards governing the treatment and disposal of oily mixtures generated from the machinery spaces of a vessel. Under MARPOL, machinery space waste may be discharged overboard into the ocean only if it does not exceed fifteen (15) parts per million ("ppm") of oil and the ship has in operation required pollution prevention equipment, to include oil filtering equipment, an alarm and an automatic stopping device known as an OWS and Oil Content Monitor, to prevent the discharge of a mixture containing more than 15 ppm of oil, the legally permitted concentration of oil.

12. Consistent with the requirements contained in the MARPOL Protocol, APPS regulations require that a non-oil tanker ship of 400 gross tons and above maintain an Oil Record Book ("ORB") in which all disposals of oil residue and the discharge overboard or disposal otherwise of bilge waste and sludge that have accumulated in the machinery spaces must be

4

recorded. 33 C.F.R. § 151.25(d). Specifically, discharges of bilge waste, sludge, and oily mixtures must be fully recorded, without delay, in the ORB by the person in charge of the operations. *Id.* The ORB also must contain entries concerning any emergency, accidental, or other exceptional discharges of oil or mixtures. 33 C.F.R. § 151.25(g). The ORB must be maintained onboard the vessel for not fewer than three years, and be readily available for inspection at all reasonable times. 33 C.F.R. § 151.25.

13.    The USCG, an agency of the United States Department of Homeland Security, is charged with enforcing the laws of the United States and is empowered under 14 U.S.C. § 89(a) to board vessels and conduct inspections and investigations of potential violations of international and United States law, including the MARPOL Protocol and APPS. In conducting inspections, commonly known as Port State Control ("PSC") inspections, USCG personnel rely on the statements of the vessel's crew and documents, including information contained in the ORB. The USCG is specifically authorized to examine the vessel's ORB to determine, among other things, whether the vessel has operable pollution prevention equipment and appropriate procedures, whether it poses any danger to United States' ports and waters, and whether the vessel has discharged any machinery space waste in violation of the MARPOL Protocol, APPS, or any applicable federal regulations. 33 C.F.R. § 151.23(a)(3) and (c). If the USCG finds evidence that a vessel is not in substantial compliance with the MARPOL Protocol or APPS, the USCG is empowered to deny a vessel's entry into a United States' port or detain the vessel until it is determined that the vessel does not present an unreasonable threat to the marine environment. 33 C.F.R. § 151.07(b) and 151.23(b).

## THE INVESTIGATION AND CRIMINAL OFFENSE

14.     On or about April 14, 2013, the M/V ANTONIS G. PAPPADAKIS docked in the Norfolk Southern Coal Terminal in Norfolk, VA, within the Eastern District of Virginia. On that date, the Chief Engineer was Lampros Katsipis.

15.     On April 15, 2013, within the special maritime and territorial jurisdiction of the United States and the Eastern District of Virginia, USCG Investigators Kellyn Erickson, Alex Lekander and Jeffrey Pennington boarded the M/V ANTONIS G. PAPPADAKIS to conduct a Post State Control safety exam while the vessel was moored at the Norfolk Southern Coal Terminal in Norfolk, VA. On April 15, 2013, your affiant learned from USCG Sector Hampton Roads, VA, that the Second Assistant Engineer passed a note to Lekander stating the vessel's crew had discharged oily bilge water overboard through the vessel's Marine Sanitation System (MSD) at the direction of Katsipis without first processing it through the Oily Water Separator as required. The Second Engineer also passed a camera to Erickson that contained photos of the arranged portable pump and hoses used to transfer the oily bilge water from the bilge holding tank to the MSD, and showed Lekander the location of the pump and hoses. The pump and hoses were located in the vessel's steering gear compartment room by USCG inspectors and were confiscated.

16.     Inspectors reviewed the ship's Oil Record Book and saw no entries recording any direct discharges of oily bilge water overboard without first being processed through the Oily Water Separator as required or any direct discharges made through the ship's MSD. Inspectors also discovered that the OWS was inoperable because the Chief Engineer was unable to get the OWS supply pump to operate and did not know how to operate the Oil Content Monitor. Furthermore, Inspectors noticed inconsistencies between the current Chief Engineer's ORB

entries and the two previous Chief Engineer's ORB entries. Specifically, the amounts of oily bilge mixtures produced and contained in the bilge water holding tank were drastically less, off by as much as a factor of four, shortly after the current Chief Engineer embarked on May 1, 2012.

17.     From April 15 through April 16 2013, the engineering crew was interviewed. The Second Assistant Engineer provided information detailing the discharge operation to the PSCOs, and then confirmed his statement during a second and third round of interviews. The Second Engineer recalled discharges taking place on approximately four (4) occasions in the past several months. At this time, no other members of the crew corroborated the Second Assistant Engineer's allegations..

18.     However, on April 17, 2013, another round of interviews were conducted with the engineering crew onboard the vessel. According to the crew members, immediately prior to being interviewed by Coast Guard inspectors and just before they entered the interview room, the crew members were approached by Katsipis, their direct superior, and directed not tell the Coast Guard inspectors anything about the discharging of bilge waste through the MSD that had taken place. In the interviews, however, the crew members chose to disobey Katsipis' order to lie and the two Third Assistant Engineers, the Cadet and the Electrician validated the information the Second Assistant Engineer previously provided. However it was apparent to the Coast Guard inspectors that several of the engineering crewmembers were frightened and extremely nervous during the interviews when discussing the discharging through the MSD. The crew members expressed concern for their jobs and feared not being able to provide for their families if they were blacklisted from the shipping industry for being truthful with the Coast Guard inspectors. The information provided during multiple interviews of the engineer crew revealed that the

engine room crew members, at the direction of Chief Engineer Katsipis, illegally discharged oily water mixtures collected in the engine room directly overboard and into the sea through the MSD. None of these discharges were processed through pollution prevention equipment or recorded in the ORB by Katsipis as required. Katsispis was the only one who had possession of the ORB and was the only one to record data into the ORB.

19.     The PSCOs confirmed the hose that crew members stated was used to facilitate the transfers was able to reach from the Bilge Holding Tank to the MSD. PSCOs further determined the alleged by-pass method could be accomplished using the identified pump and hoses, as described by the crew. The crewmembers statements were further corroborated by samples taken from the MSD that confirmed the presence of oil in the MSD overboard discharge piping where there should not be any oil.

20.     Based upon the forgoing, there is probable cause to believe that Kassian, acting through its agents and employees who were acting within the scope of their agency and employment and for the benefit of, at least in part, Kassian, has knowingly altered, destroyed, mutilated, concealed, covered up, falsified, and made a false entry in any record, document, or tangible object, to wit: an oil record book, with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States by failing to maintain an accurate ORB, in violation of 18 U.S.C. § 1519.

SA Maria B. Milbourne
U.S. Coast Guard Investigative Service

Subscribed and sworn before me this ___9th___ day of May, 2013

United States Magistrate Judge